STATE OF WEST VIRGINIA

*v.*

AMELIA MARINITSIS

(No. 9881)

Submitted September 4, 1947.   Decided November 4, 1947

614

*James J. Laughlin,* and *George H. Williams,* for plaintiff in error.

*Ira J. Partlow,* Attorney General, and *J. Chandler Curd,* Assistant Attorney General, for defendant in error.

KENNA, JUDGE:

Amelia Marinitsis, alias Molly Marinitsis, and Mike Marinitsis, her father, were indicted in the Circuit Court of Hampshire County, the indictment containing two counts, the first charging Molly Marinitsis with having maliciously and feloniously set fire to and burned the frame "dwelling house" of Mike and Chriso Marinitsis located in Hampshire County near Augusta, the second charging Mike Marinitsis with having maliciously and feloniously counseled, procured and abetted in the commission of that felony. At the conclusion of the State's evidence the court sustained a motion to dismiss Mike Marinitsis because it was not shown that he was implicated. Molly Marinitsis was convicted of arson in the first degree and sentenced to an indeterminate confinement in the state penitentiary of from two to twenty years. From the final order this writ of error was granted.

Of the sixteen general assignments of error, upon submission all seem to have been abandoned except questions that turn upon the sufficiency of the indictment, the refusal of the trial court to direct a verdict for the defendant upon the conclusion of the State's evidence, the introduction of fire insurance policies covering the dwelling in question, the testimony of certain witnesses concerning foot tracks contended by the State to show the presence of the defendant at a time and place different from that stated in her testimony, the refusal to strike out the testimony of two witnesses concerning statements made by Mike Marinitsis of his intention to burn the dwelling

and collect the insurance thereon if and when his business became poor, and the refusal to grant defendant's motion for a view of the pick-up truck at the same distance the witness Michael for the State testified he could identify it by its insignia. There having been a conviction, in stating what we regard as the facts established by the record we will, in case of conflict, favor the State's contention in considering the sufficiency of the State's proof.

Mike Marinitsis and Chriso, his wife, came to this country from Greece with their daughter Amelia, and eventually settled in Romney in 1929. Marinitsis became engaged in the restaurant business and, since he and his wife could not read and write English, which they spoke brokenly, depended largely upon his daughter in business matters. He was so engaged at the happening of the occurrences on which this prosecution is based.

By deed dated September 24, 1943, Sallie L. Loy, widow, and E. June Loy conveyed to Mike and Chriso Marinitsis a tract of ninety-two acres lying on two secondary roads within approximately one and one-fifth miles of Augusta on Route 50 east of Romney. This property was principally orchards of apples and peaches and, in addition to a two story seven room frame dwelling had on it a barn and various other outbuildings. The Marinitsises paid $7,800.00 cash, and in order to do so borrowed from the Bank of Romney $4,500.00 to secure which they executed to the bank's trustee a trust deed upon the property and delivered to the bank a fire insurance policy, with a standard mortgage clause attached, written by the Queen Insurance Company of America for a three year term beginning September 25, 1943, the aggregate coverage of which was $5,500.00, the dwelling being insured for $4,000.00. The coverage of this policy included no personal property.

Upon acquiring the property the Marinitsises immediately began its renovation, painting and redecorating the dwelling, repairing the outbuildings and improving the condition of the orchard so that at the time of trial Mike Marinitsis testified without contradiction that the property was worth $15,000.00.

Supposedly because he had been told that the misspelling of his name made the Queen's policy unenforceable, in February, 1945, Marinitsis applied for and received from Franklin National Insurance Company a policy he says he intended to replace the Queen's policy, the total coverage of which was $9,300.00, including $2,000.00 upon personal property.

The Marinitsises employed a foreman who lived in the dwelling on the farm, took charge of the orchard and had general charge of the place's operation. Either the daughter or the father and daughter, he being unable to drive an automobile, went from Romney to the farm almost daily in either a Buick passenger car or a Dodge pick-up truck and the family occasionally spent the night there in the two upstairs bedrooms. At intervals they entertained their Greek friends.

When Marinitsis obtained the larger policy from the Franklin he testified that he surrendered the Queen's policy to the agent in Romney with instructions to cancel. There is some confusion in the record as to whether the Queen's policy was actually canceled, but it seems established that at the time of the fire it was not in the possession of the Bank of Romney nor of Marinitsis, who testified, however, that he had gotten an insurance check from a company, the name of which he did not recollect. This could, of course, have been a refund for the unearned premium of the Queen's policy.

On Sunday, March 11, 1945, Marinitsis and his daughter Molly drove in their Buick from Romney to the farm, arriving between ten and ten-thirty. After parking the automobile Marinitsis started to search for a horse that had the habit of jumping the fence and going off the place, and his daughter started into the dwelling. At this time there was no caretaker on the place and had not been for several months. As Molly approached the place she saw smoke coming from a lean-to kitchen on the ground floor and called to her father. They went in the kitchen together and succeeded in putting out a fire that had burned through a beaver-board mounted on studding, being the

inner kitchen wall. There is some confusion in the record as to whether this fire originated from waste packing in a pump located in the kitchen and connected with the cistern. At any rate, after the fire was extinguished Marinitsis continued his search for the horse and his daughter remained in or near the dwelling until, according to her testimony and that of Marinitsis, she discovered dense smoke on the second floor. She again called her father and, upon attempting to go to the second floor, they decided that it would be impossible for them to overcome the fire on account of the dense smoke. They decided to call the Romney Fire Department. The daughter says she attempted to use the telephone from the house, but could not get Romney through the Augusta exchange because there was no operator on duty there on Sunday. They therefore got in the car and drove to Augusta where there were direct lines to Romney. They went to the home of W. H. McKee where Molly talked to the Romney operator and told her to send the Romney Fire Department to the fire at the Marinitsis place. They then returned to the farm and were followed almost immediately by Hoy McKee, Arlie W. Keister and Harry Wolford, all from Augusta. At that time the smoke on the second floor was quite heavy and none could endure it with the single exception of Hoy McKee. With him as its spearhead they formed a bucket brigade with several two or three gallon buckets that they dipped into the cistern and chained to McKee who threw it on the fire, which he finally succeeded in extinguishing before the arrival of the fire truck from Romney. The Romney company of firemen examined the house and undertook to discover the origin of the fire but except for ascertaining that in none of their opinions did it originate from electric wiring or short circuits, reached no conclusion.

In one of the upstairs bedrooms there seems to have been a fire in two locations, one a pile of pillows on the floor and the other a bed tick or mattress on a metal bedstead. The smoke seems to have been so heavy that soot settled on the walls and the floor. In the other upstairs

bedroom there had also been soot and there was found on the floor a glass kerosene lamp with a chimney heavily sooted but not warm. There was no furniture in either of the upper bedrooms with the exception of that mentioned.

On the morning of Monday, March 12, Walter Ruckman, employed by the State Road Commission as night watchman in what is called their vehicle "shed" near Romney, and whose home was on Ford Hill near the Marinitsis farm, in leaving his work at about seven A. M. passed the Marinitsis place on his way home, saw that the window blinds were aflame in the front downstairs room and upon making that discovery returned to the home of Ira Michael which he had just passed and had Michael call the fire truck at Romney and notify Marinitsis. After that was done he came to Michael's front porch and discovered that the fire had broken out upon what he called the front portico. He estimates the time to have been between seven-thirty and eight A. M.

Ira Michael, whose home is within four hundred feet of the Marinitsis farm, testifies that that morning, as he was feeding his chickens, he saw a green Dodge pick-up truck backing into the Marinitsis place from the ridge road near the side gate, and that it was still there as he went into the house. He says that Walter Ruckman came after he had gone to the breakfast table and told him that the Marinitsis house was on fire. He went to the telephone and told the operator to inform the Romney fire company. He testifies that that evening he saw the same Dodge pick-up truck with Marinitsis and a colored man in it driving over the hill from Augusta and that he saw it on another occasion parked double in Romney immediately outside the Marinitsis place of business.

Marinitsis testifies that on Monday morning he arose late and went to the restaurant; that before he got up his daughter came into his bedroom shortly after her alarm went off at seven o'clock and asked for the keys of the pick-up truck, stating that she was going out to pick some

greens and that James Streets, a colored man who worked for the Marinitsises to truck their beer from Cumberland, was waiting for her. She got the keys and her father says he did not see her again until after he and his wife had gone to the fire. They were informed by a neighbor that their house was on fire and went at once to the Romney fire station, from where a man by the name of Schwalb took them both to the farm in his car after the fire truck had left Romney.

The testimony of Molly Marinitsis is that she had gone with the colored man, Jim Streets, to a point on Route 50 "above Patterson's store" where, after picking her greens, at about seven-thirty she heard the fire siren and was told by a driver in another car that her father's house was on fire. In this connection Riley Hannas testified that she stopped at his place in a pick-up, driving toward Augusta, went into his meadow at about eight o'clock and picked greens. He testifies that he found the tracks of a woman's shoes at the exact place that he saw her. This she denies. At any rate, her testimony is that from Patterson's store she drove back to Romney, tried to find her father and mother, let out the colored man Streets and then drove to the farm as fast as she could. Witnesses for the State testify that they saw her driving from Augusta toward the farm shortly before the fire alarm; others that they saw her shortly after the alarm driving in a direction from the farm toward Romney. This she denies.

As to the sufficiency of the indictment, it is, as against Amelia Marinitsis, a charge of arson in the first degree as principal under Section 1 of Chapter 105, Acts of 1935 [W. Va. Code (Michie, 1943) Ch. 61, Art. 3, Sec. 1], for wilfully and maliciously burning or causing to be burned a dwelling house, and against Mike Marinitsis as accessory before the fact in the commission of that felony. This joinder is proper under Code, 61-11-7. The plaintiff in error urges that she was prejudiced by the admission of testimony showing that the dwelling that was burned was insured against fire, possibly in an amount that exceeded its value and certainly in an amount above its

purchase price in 1943. She takes the position that under Section 5 of Chapter 105, Acts of 1935 [W. Va. Code (Michie, 1943) Chap. 61, Art. 3, Sec. 5], it is a separate felony to burn an insured building and that it was error to permit the State to prove an offense different from the offense with which she was charged. Of course, if under Section 1 of Chapter 105, Acts of 1935 [W. Va. Code (Michie, 1935) Ch. 61, Art 3, Sec. 1], proof that burned property was insured is improper because expressly made an offense by another section, it would seem to follow that under Section 5 of Chapter 105, Acts of 1935 [W. Va. Code (Michie, 1935) Ch. 61, Art. 3, Sec. 5], for the same reason it could not be shown that the property destroyed by fire was a "dwelling house" etc. That principle, if strictly applied, would mean that where the proof showed that the property burned was both insured and a "dwelling house," etc., as here, prejudicial error would be unavoidable under either section. The State undertakes to meet the accused's contention by maintaining that proof of fire insurance upon the burned building, regardless of other offenses so proven, was relevant to the offense charged for the purpose of establishing wilfulness and malice or motive. We believe that it is unnecessary to cite authority to sustain the generally recognized principle that indictments for one crime frequently embrace kindred offenses, and that evidence relevant to the offense charged, even though also relevant to the kindred offense, or, as here, relating to one of its elements, is not erroneously admitted. We are of the opinion that the trial court did not err in overruling the demurrer to the indictment.

For the reasons already stated we are of the opinion that it was not error to permit the State to show that about sixty days before the fire Marinitsis had nearly doubled his fire insurance on the buildings and personal property on his farm.

The plaintiff in error contends that the testimony of Riley Hannas and Sheriff Parsons concerning foot tracks in Hannas' field was erroneously admitted. As we understand this testimony its purpose was to corroborate

the testimony of Hannas that he had seen Molly Marinitsis on the highway through his farm at approximately the same time that she later testified she was elsewhere a little while after the fire on March 12. The whereabouts of the accused at the time of the commission of the offense is nearly always relevant, and since the testimony concerning these tracks is merely in corroboration of the testimony of Hannas its relevance must rise or fall according to the relevance of the testimony it is intended to support. Being of the opinion that the principal testimony was relevant, we also believe that the supporting proof was properly admitted.

The testimony of Gilbert D. Starnes and of Mrs. Gilbert D. Starnes to the effect that they had heard Mike Marinitsis state that in the event his business became bad he would burn the buildings on his farm and collect the insurance we think was properly admitted. True, the circuit judge subsequently dismissed Mike Marinitsis. True, also, the testimony complained of related to his guilt directly and but indirectly to the guilt of Molly Marinitsis. But since she apparently was acting in common with her father, the record not showing that she had any earnings independent of his income, the jury had a right to conclude that their interests were the same, although possibly not of the same degree. He could not drive a car: she could. As between her and him arson more than ten miles from their place of residence would fall to her lot more naturally than to his. Her own testimony is to the effect that she was subject to his direction well nigh entirely. We are therefore of the opinion that testimony concerning his purpose in a matter of some consequence was not irrelevant in determining her object.

Concerning the view of the pick-up truck and the fact that the trial judge declined to permit the view at the exact distance that a witness had testified he recognized the trucks' insignia, we are of the opinion that the trial court committed no error. A view of any sort rests largely in the discretion of the trial judge and, unless required by statute, its refusal is rarely, if ever, error. Here the trial

court permitted a view of the truck and his refusal to have the jury view it from a measured distance corresponding to the distance from which a witness testified he had recognized its insignia was certainly not erroneous, especially when conditions are not shown to be identical in other respects. The court did permit testimony concerning the visibility from the point where the witness in question was standing to the point where the truck stood at the time the witness testified he observed it. On this point we think there was no error.

The record before the Court in this matter is quite voluminous, the trial having taken six days. Therefore, within the length of an opinion matters not specifically designated as error cannot be dealt with. In the seventh assignment of error appearing in the petition for a writ of error the plaintiff in error attempts to include all instructions tendered by the defendant below and refused "as will appear from the bills of exceptions herein." The eighth assignment deals with instructions given on behalf of the State in like manner. Neither assignment points out a specific instruction nor describes an alleged error. Turning to the bills of exceptions one finds that "Bill of Exceptions No. 2" contains twenty-five instructions given for the State and refused the defendant. None of these instructions are briefed. The assignments being plainly insufficient it is unnecessary to discuss the points attempted to be raised. We wish to direct the attention of counsel to the fact that under Code, 56-6-20, it is no longer necessary to use bills of exceptions in order to make instructions a part of the record. We have, however, attempted to discuss all questions that we think are of consequence.

Based upon the foregoing, we are of the opinion that the Circuit Court of Hampshire County committed no error in refusing to strike the State's evidence and direct a verdict of not guilty as to Amelia Marinitsis and that the record discloses no apparent error. The judgment is therefore affirmed.

*Affirmed.*